It is undisputed that Dresser-Rand has enjoyed a long-term, successful bargaining relationship with the union and that it bargained in good faith here. The company, in fact, made every effort to comply with the law while consulting counsel and did not violate the Act. But the Board is trying to push the law to favor unions. If enforced, the Board's order would substantially curb the rights of employers to negotiate with unions and to operate and manage their own affairs. The order should be denied enforcement. I will address the lockout and the recall following the lockout. Mr. Harper will address the remaining issues. Now, let's start with the lockout. As the Court knows, lockouts are perfectly legal. The Supreme Court has said, to prove otherwise, the general counsel of the Board needs to show that anti-union animus was the primary motivating cause of the lockout decision. That's from the Supreme Court's decision in Brown. Here there is absolutely no evidence of animus related in any way to the lockout decision. In fact, the evidence shows the absence of animus. Before the lockout, the parties were bargaining in good faith. That's undisputed. At the time the lockout decision was made, Dresser Rand presented a legitimate business purpose for the lockout. And during the lockout, the company continued to meet with the union and bargain in good faith. As Member Johnson said in dissenting below, the most relevant evidence of the motive behind the lockout is the lockout itself. The company locked out both the strikers and the crossovers. That should end the matter. But the Board... You're not asking us to say that you can't consider facts beyond the lockout in determining if there was anti-union animus, are you? No, we are not making that argument. But if the Court considers those other events, as the Board did here, it must connect the to the lockout decision here. Of course, here we don't believe there were any other unlawful violations, and certainly there was no animus, anti-union animus related to those other events. And that's why what the Board did is wrong, and I'll give you two reasons. The first is they never connected the dots between those. That's from this Court's decision in Florida Steel. They never showed a causal connection between those other events and the lockout decision. Some of those events, in fact, occurred many months later, nine months later in one instance. That's why there were two dissents in this case. This case went to the Board twice because of Noel Canning. Both cases, there were dissents, members Hayes and Johnson. They said that none of the later events has any tangible connection at all with the specific intent behind the lockout decision. Now what's important for this... Do they have to show that what happened nine months later caused the lockout, or that it was evidence of anti-union animus? They have to do both. They have to show that any other event was driven by...was some evidence of anti-union animus, and that that anti-union animus was the primary motivating cause of the lockout decision. There are dozens of cases that say just a generalized animus against the union, an inchoate animus, is insufficient. What you're saying, I guess, as it relates to this case, is that assuming that the motive was anti-union animus for the disciplinary conduct that it took against two of the strikers, assuming that you're totally motivated by anti-union animus, if you can't connect that to the time that the lockout occurred to show that that was anti-union animus, and there's an absence of anti-union animus with respect to the lockout, then that's irrelevant in determining what the motive was for the...whether it was anti-union animus behind the lockout itself. Right, that's exactly right. In fact, with respect to those... What is the law on that, though? I mean, is that what I've just referred to? Is that the law, or is that just your argument? No, that is the law, and we've cited many cases to the court in our briefs where if the court or the board looks at other events to find animus, they've got to connect it to the lockout decision. That's the Florida Steel case that I mentioned. Here, of course, those two discharges that you mentioned, Your Honor, as to one, the discharge of Mr. Brown, the ALJ, in fact, that Dresser ran had a good faith basis for that discharge, and we can address that. Mr. Harper can address that at the court once. We believe that was not a violation. With respect to the other discharge, that occurred five months after the lockout, five months after the strikers had been... Was that a scam? Yes, sir. Exactly. Was that a discharge, or... I'm sorry. It was a two-day suspension. Right. Now, on appeal, the board makes two brand-new arguments. We cited to the court the Metropolitan Life decision by the Supreme Court that says the board can't do that. It is bound by the reasons it gave below, and so the court shouldn't consider those. Now, I'd like to shift over to talking about the recall, and I'll start with the bargaining over the recall. This is a very important issue to the company. As the court knows, the requirement to bargain generally is fairly limited. The employer needs to provide notice of its decision and then give the union a reasonable opportunity to respond, and that's to be judged in the specific circumstances at issue here. Dresser ran easily satisfies that obligation. It was undisputed that once the lockout ended, everybody wanted the strikers to be returned and reinstated as soon as possible. The union, in fact, on the day the lockout ended, told its members that they could report to work, everybody should report to work at 7 a.m. the next day. Dresser ran and said, hold on, we've got to assess our manpower needs. The strike had lasted 16 weeks, and so that afternoon, the union made its initial proposal for recall by seniority. Dresser ran said, give us 24 hours to think about it the next afternoon, Friday. Okay, let's talk about when you first announced that the lockout was over and you were going to begin production on Monday, right? I believe the employees were going to be recalled Tuesday. Tuesday. What day was it that you announced the termination of the lockout? Thursday morning. And then that afternoon, there was a conference call between the union and Dresser ran in which the union said, we request that the strikers be recalled by seniority. The next day, that Friday afternoon, the company said, emailed the very person, the outside counsel that the union had said we want you to be bargaining with, and said, we propose recall by a mixture of seniority and performance. And then they said, please call us if you have any questions, email us over the weekend. We are going to be working all weekend long to put together a list so that we can get the strikers back to work as soon as possible. And the union lawyer responded. He said, I've got your email and I will check email through the weekend, but he did not on Friday afternoon. That's right. That evening. He did not object to address a ransom proposal. He did not counter propose. And importantly, he did not request a delay. So the company worked all weekend, did as promised, sent the list to the union lawyer on Sunday morning and said, here, here, we've put together the list according to anything happened on Saturday other than you're working to try to put the list together. We all at that point, there was an email that evening between Dresser Rand and the union lawyer to tell them that we were running behind and we expected to send the list the next morning. But you didn't hear from the union lawyer. That's exactly right. We never heard from the union. Did you tell them that you were going to give preference to the crossovers to call them? That was not discussed. And I can address that separately in a second. So under those circumstances, Dresser Rand clearly satisfied its bargaining obligation. I mean, it was between a rock and a hard place. If it had not recalled the strikers immediately or worked expeditiously to get them, it faced an unfair labor practice charge with respect to that. And then here, when they worked hard, they made every effort to communicate with the union and never heard back from the union. You don't have to rush through it. We'll give you a minute. Because, I mean, so that you can set out your arguments, we'll give the other side the same opportunity to set out their arguments clearly. But now, what happened on Sunday? So on Sunday morning, the company sent an email to the union lawyer and said, here's our list. Here's a more detailed analysis of our proposal. Here's a list of the employees that we'll begin recalling. We expect to call them later today and Monday for a recall on, for them to begin working on Tuesday. All right. And then, so what did you hear from the union on Sunday? Never heard from the union. The union lawyer tested. What did you hear from the union on Monday? We didn't hear from the union until, I believe it was Tuesday. What, did you have any further communications on Sunday, Monday with the union? No. So where had you left it exactly? What was your last communication with the union? That this is the proposed list that we would, that we propose to begin recalling the strikers. Call us if you have any questions. There was a, there was, it was clearly indicated in that communication that we anticipated that the union could respond or come back to us if they wanted to discuss it further. Were the crossovers listed at the? Crossovers were not listed in the, in the list of returning strikers. And as. They know that you had, but in the meantime, at some point, you reinstated the crossover. That's right. And, and, and that. Or anybody else. That's correct. Without consulting with the union. That's correct. And that is entirely permitted by the Supreme Court's decision in TWA. In that case, crossovers had been reinstated, and after the strike ended, the, the more senior full-term strikers said, okay, you now need to displace these crossovers and let us come back. And the Supreme Court said, no, we can protect the rights of employees who don't want to strike just as, as much as we can protect those who choose to strike. Does that mean you aren't required to bargain over it? That's correct. We were not required to bargain over them. And that case squarely applies here. Now, the board says. You're saying you're not required to bargain over it because it is a matter of law. Correct. That you were entitled to what you were entitled to. Exactly. And the board says the TWA case doesn't apply because there had been, there was a lockout here, and that freed up the positions of the crossovers. But that's where this court's decision in Delta-Macon comes in, where the court said laying off permanent replacements does not create a, a vacancy that then can be filled by waiting strikers. And that's the case that we cited to the court here. The crossovers clearly expected that they would be recalled after, at the end of the layoff, or at the end of the lockout, and they were. Okay, Mr. Carnell, you've saved some time for rebuttal. Thank you, sir. Mr. Harper, we'll hear from you next. Good morning, and may it please the Court. John Harper III on behalf of Petitioner Dresserand. I will address Dresserand's implementation of its weekend paid lunch break policy and whether certain returning strikers had accrued vacation at the time that they returned. If the Court has any questions with respect to the Kelvin Brown discharge, I'm happy to address those as well. Turning first to the weekend lunch break and vacation issues, both the lunch break and the vacation issues required the Board to interpret Dresserand's November 2007 lawfully implemented terms and how those terms changed the 2004 collective bargaining agreement. As this Court stated in Strand, Theodore v. NLRB, the Court does not owe any deference to the Board's contract interpretations and reviews them de novo. First with respect to the weekend lunch breaks, Dresserand did not commit a violation with respect to the weekend lunch breaks because all it was doing was implementing its lawfully implemented November 29, 2007 terms. The implemented terms authorized the change to when Dresserand paid weekend lunch breaks for two primary reasons. Number one. The argument of the Board is that you withdrew a benefit without bargaining. Is that what their argument is? That is the Board's argument. Why isn't that so? Because Dresserand lawfully implemented the November 29, 2007 terms. There's no challenge to whether those terms were lawfully implemented or not. And as this Court is aware, in order to lawfully implement terms, you have to present those terms when you implement them. But, I mean, and their argument also is that this was by custom and practice, not in writing, and it's a custom that you changed without bargaining with them. That's correct. And Dresserand's position is that the lawfully implemented terms changed that past practice. It changed the very language on which that past practice was based by changing the definition of the work week. And so under the 2004 CBA, the work week was clearly defined as Monday through Friday, eight hours a day. Under the 2007 implemented terms, it gave Dresserand the right to implement alternative schedules as needed. So, for example, it could implement a Tuesday through Saturday schedule. The implemented terms also changed the time when overtime was to be paid. And so the implemented terms made clear that overtime was to be paid only over 40 hours. And any premium pay on a Saturday, for example, would only be paid after 40 hours was met. And so what the ALJ said was that all work on Saturday, under the old terms and under the new terms, was overtime. But that's not necessarily true. Even if you start on a Tuesday? I'm sorry? Even if you start on a Tuesday? That's what the ALJ said, and that's why I believe the ALJ was incorrect with respect to his interpretation of the implemented terms, because Saturday could be a straight-time day, number one. Number two, if you read carefully the implemented terms, it talks about eight hours and a workday. And that is a full workday. They also talk about you have to work four hours of overtime in any given day in order to receive the paid lunch break. And so what the postings say in the record of General Counsel Exhibit 27 and Respondent Exhibit 69 is it says that work over 12 hours in a day is when you get your paid lunch break. That's any given day of eight hours plus four hours of overtime, which is exactly what the November 2007 implemented terms state. And so for these reasons, we believe that the ALJ simply did not properly interpret the 2007 implemented terms and how those terms changed the 2004 collective bargaining agreement. We believe that his decision on this point should be denied enforcement. Turning to the vacation issue, Address Iran did not violate the Act by denying the vacation benefits to the strikers that were returning in August and September 2008, either. And once again, this requires an interpretation of the 2007 implemented terms and how those terms changed the 2004 agreement. And so it's undisputed that under the 2007 implemented terms— In other words, if you have two legitimate arguments, I mean two arguments, one says that the vacation should have been paid as the union says, and one argument says it should be paid as you say. And they're both plausible arguments. It's not an unfair labor practice, as I would understand it. It's taking one position over another. That is correct. And I believe what the case law says from Texaco, from this court, and then the Vesuvius Crucible case, which we cited, is that as long as the company has a reasonable, nondiscriminatory basis for its interpretation of the Act or interpretation of the implemented terms, it's not an unfair labor practice. And even more specifically than that, I think we would take issue with respect to the ALJ's determination that there was accrued vacation here in the first place. And so that goes to the General Counsel's prima facie case. He has to show that the vacation was accrued and that it was denied on the apparent basis of a strike under Texaco. We don't believe the vacation was accrued here. Under the 2004 CBA, there were two accrual requirements under Section 14N of that matter. I don't think you need to explain it. I mean, you've got an argument, in a way, a plausible argument. So to win an argument really doesn't matter. That is Dr. Rios' position, yes. Okay. Thank you, Mr. Hoffman. Thank you. Mr. Barrett for the NLRB. We'll hear from you. Good morning. May it please the Court. My name is Jeff Barrett. I'm here on behalf of the National Labor Relations Board. Your Honors, after the company's union employees returned to work from a strike that lasted for several months, the company at that point made its decision to lock out its employees, to lock out the individuals who had exercised their Section 7 rights to engage in strike activity, including both those who were the full-term strikers, who carried on until the end, until the unconditional offer was made by the union to return to work, as well as the crossover employees who returned to work during the course of the strike. It made this decision. The Board found... Are you saying... What are you saying? Am I saying that? What are you saying? I mean, are you saying they couldn't do it, that they committed an unfair labor practice by locking them out at that point? No. It's well established in the Board law that locking out employees to bring economic pressure to bear is lawful. Okay. So why was it here? Was it lawful, absent any of the post-lockout conduct? Well, I mean, that was... That would be a different case, of course, but if it was based purely on... I'm asking you, you are solely dependent upon the post-argument conduct for the argument that the lockout was an unfair labor practice. We're relying on the post-lockout conduct to establish animus. Now, the fact of the... And this is an area I would like to address, is this idea that the Board engaged in a post-talk rationalization by discussing what I call this perfect correlation idea. Let me have an answer to my question. And that is, if we don't consider the post-lockout conduct, then you have no argument that there is an illegality taint to the lockout itself. Is that correct or incorrect? That is correct. The Board's animus finding is based on the post-lockout conduct. Yes, Your Honor. I'm sorry, I didn't offer a more clear argument. No, that's okay. That's okay. Now, as far as the post-talk rationalization idea, the Board did not... The ALJ found that the mere fact that there was a partial lockout, a partial lockout I'm referring to because they did not lock out the permanent replacements, the ALJ found that that was not evidence of animus. The Board is not arguing otherwise in its proof. The company is characterizing the Board as suggesting that the mere fact that there was a partial lockout constitutes evidence of animus. It's not. The partial lockout shows an initial action where there was a correlation between who was locked out and who had engaged in strike activity. So there's a perfect correlation there. But that doesn't touch on the animus finding. And I just wanted to make that clear in case there was any ambiguity in the brief. I don't believe there is, and I think there is a clear finding by the ALJ that that wasn't the case, and we're not arguing otherwise. What that did is that triggered this analysis, this Great Dane analysis, as to whether or not there was a legitimate business justification for the company's lockout, and whether or not then the General Counsel can establish animus, the company's animus for locking out its employees. Now here the Board found it was unnecessary to address whether there was a business justification because even if there was, the Board moved on to its animus, the animus findings and the animus burden that the General Counsel bore and found that there was sufficient evidence. All right. Now, so address the primary argument that they are making, and that is the nexus. You've conceded, it seems to me that you've conceded that the lockout itself, standing alone, is not illegal, and that the animus that would motivate the lockout, it seems to me, would have to have occurred before the lockout. Otherwise, there's no animus that you can attach to the decision of locking out. Now, why is that? Is that premise that I've asserted in agreement with the argument that you are making? The first part is, as far as whether or not the evidence needs to come before or after, I believe that's where we might depart an opinion. Okay. Well, not to interfere with your argument too much, but they say you cannot connect this to the time that the decision was made to lock out. So address that. Your Honor, the lockout, the employees made an unconditional return to work on November 19. At that point, they became bargaining unit employees entitled to immediate reinstatement along with the crossovers who had already returned to work. The company chose to lock out the employees on November 23rd. By November 29th is when the company chose to end the lockout, immediately recall the crossovers, not include them in any recall procedures, but give them that preferential treatment. And I would like to address each of these individually, but I'm just showing you that these are contemporaneous actions that were engaged in. It was all going on at the same time. Did it precede the company's decision to lockout? No, it didn't. But the Board, drawing on its expertise, and we would, you know, ask for deference on the Board's motivation finding. The Board makes motivation findings in many different cases, looks at the totality of the evidence, and did nothing other than that here, and found that by the company's actions, it revealed the animus that had precipitated, that had led it to lock out the employees. Was it before? No, but it was at the same time as everything that was going on. By November 29th, again, they started engaging in these actions quite swiftly. So you're connecting, as I understand your argument, you're connecting the animus by some abstraction. That is, I mean, you're admitting that it is not tangible evidence at the time that the lockout occurred, but somehow this was prejudice that was hovering in an abstract way over every decision the company made. Well, as your Honors know, and as the dissent pointed out of the Board, there is no smoking gun, but the Board is frequently called on to rely on circumstantial evidence to draw inferences. And what we said is, yeah, there is no gun. Not that there's no smoking gun, but there's no gun. No smoke, no gun. There was certainly no admission by the counsel or by company. It seems to me that whether they had the right to give the crossovers preferential treatment is a question of law, right? Yes. And if we rule for, if we just conclude that they had the right to give the crossovers preferential treatment and that's not under labor practice, then where are you? I would obviously take issue with the Court making that finding, but addressing— But that's a pure question of law. Well, I mean, it's a question of law, but it's a question of law that has not been resolved as the company has suggested. I'm just saying, it's open. I don't think either side has given us a case on all fours, have they? I think that's right. We're kind of in the middle area, and we're going to have to pick one way or the other. Well, I mean, it is for the Board to make these decisions about what constitutes a violation of the National Labor Relations Act and applying its expertise in determining the treatment that the crossovers are accorded as opposed to this full-term strikers versus the permanent replacements. So it does involve— But we've got some guidance. We've got some markers on either end. This is, this isn't, and this particular situation is sort of in the middle. Well, the Board found that it was not. I'm saying as a legal matter, we're going to have to decide whether it's closer to this end or this end of the case law, right? I suppose so, Your Honor, yes. Okay. Let's assume we disagree with the Board and say, no, it's not a violation as a matter of law. Then where are you? Well, that was the conduct that was engaged in November 29, when the company immediately started calling the crossover employees as soon as the lockout ended. Now, at that point, that day, the union invoked its right to bargain over the recall procedures, and the company refused to bargain over this. Now, I would take a bit of an issue with the characterization of the facts that the company offered. I'd like to review them very quickly. It's been found both in an email. Take your time. We haven't got a whole lot of arguments. Right. So I believe it was General Counsel Exhibit 13, as well as findings by the Administrative Law Judge that during a phone conversation on November 29, the union made a clear request to bargain over the recall procedures. The company's response was, and they made it clear that they not only wished to bargain but expected the individuals to be recalled on the basis of seniority. Now, the company suggests both today and in its brief that it responded, and it responded with its plan to recall individuals based on performance factors as well as seniority. But I would direct the Court's attention to the letter in which they did that, which is General Counsel Exhibit 14. Now, what the company informed the union was that it would provide a list that would rank employees through a mixture of performance and seniority. Now, that was the end of what it said about its intent to recall as far as the plan. What day was that letter? That was on November 30th. What day? Friday. No one responded until Tuesday? Well, not exactly. There was additional correspondence, but what the company had told the union is, we are working on our plan. We will send you the plan that we'll propose. It said it would provide it on Saturday. It didn't provide it on Saturday. It said it would, you know, I believe there was an e-mail saying we need another day. So on Sunday, this 11-11 e-mail that was sent, which is General Counsel Exhibit 17, again, sent on Sunday morning, was the first time that the company actually laid out its plan. Now, in this document, you'll see that this was. . . By naming names, identifying. It's not merely identifying, and I think that's something I would certainly like to clarify. It's not as if they had announced their plan and this was the application of that plan and providing a list. It was a detailed three-page single-space document describing the particular factors that would go into deciding who would be recalled in what order. So none of these details were made available to the union before Sunday morning. It also came with a list. So in addition to putting together that list, that process over the course of the weekend, it then applied that process to the workers and determined what the preferential list was. But it was only at that point, 11-11 in the morning on Sunday, December 2nd, that the union knew, okay, now we know what the company is planning to do. Until then, the company. . . I mean, there seemed to be a basic disagreement over whether or not performance could be considered, but there was never any indication given of how the company. . . From their point of view, they announced that they were going to go to work on Tuesday, and they announced that on Thursday. So the union had full notice of that, and you never asked for a delay or never objected other than to the absence of a pure seniority recall, right? They did not ask for a delay. What they had done is they invoked their right to bargain. The company finally sent this plan on Sunday morning, and within hours had begun contacting the employees about who was to return.  It implemented its plan without further communication about how they would go about negotiating these terms. Well, it wasn't rejected. I mean, you can't negotiate by yourself. You say, here's the plan, and somebody says, oh, I don't like the plan. Do this. But that didn't happen. Well, it didn't happen, I mean, because at that point, that's when the ALJ's findings that this was presented as a fait accompli come in. It was a plan that was not said, this is what we're proposing. It's this is the plan, and they immediately started executing on that plan. But that kind of thing happens all the time in union negotiations or contracts. In other words, you say, this is what I'm going to do. And then the other side says, oh, no, you're not. You're not talking to me. And if you do this, we're going to, you know, all hell's going to break loose. Well, if that were the situation here, we might have a different result. But here the situation was that the company was on clear notice that the union wanted to sit down and negotiate with this. And it was not upon the union to suggest, now that you have this plan. I don't think, did the union ever say, we need to negotiate this? Or did they just say, we think this ought to be on a strict seniority basis? No, they invoked negotiations specifically and expressly. They did? When? Pardon? When? On Thursday, November 29th. So the company was aware. Well, what did they tell me about that? On Thursday. No, that's the day they announced that they were going to go to work on Tuesday. Yes, and as the administrative law judge found, there was a kind of a central or key phone conversation amongst the union leaders and management leaders on the 29th, that during which there was, I believe there was an admission by the company that the union had made, in fact, a request to negotiate. Then there was, and I'm looking for it, I believe it's in General Counsel Exhibit 13. So the union did make a request to negotiate on Thursday. Yes. Negotiate the return of the strikers. That's right. They said that we want to, you know, there's going to be a recall. We want to negotiate this, and we believe it should be based on seniority. That's when the company said, give us a chance. Give us a chance to put this plan together. And it wasn't until Sunday that the company acted on this. Now, there is, of course, all the parties. But they told you going in that their generalized plan wasn't going to be strictly seniority based. So you knew at that point that what you were expecting to get would not be what you asked for. Yes, Your Honor. And then they finally gave you the details, a counterproposal it seems to me, on Sunday of what exactly how they were going to come up with the terms, which was what you expected more or less. Which is what you would expect. However, what you do not expect or what the law does not allow is for them to immediately implement those terms. There needs to be the opportunity to review this plan. The argument on that would be that you knew they were going to start on Tuesday. And you knew this is the way they were going to start on Tuesday. Yes, Your Honor. And so you did know that. Well, as I said, the board made a finding that this was akin to a fait accompli, that it was not in fact a counteroffer, that it was in fact a this is how it's going to be done. And at that point, the damage has been done. What was the union response on Tuesday at 9 o'clock? Was it at 9 o'clock in the morning? I forgot when. I believe it was Tuesday morning. I believe they raised an objection to the method of the recall. But I think that I'm sorry to do this. I think I'll have to defer to my colleague who was on the ground at the time who can probably provide some satisfying details of exactly what went on. There was an objection raised, and, yes, it was on Tuesday morning. Were there discussions, continuing discussions about it after that? I don't believe that there was. At that point, it was treated, it was the employees were coming back to work. This was the plan that the company had said it was utilizing, and there were no negotiations at that point. If I'm— Is Heirless Pump your best case that your argument that Dresser did not have the right to give priority to the crossovers and did not have to bargain over giving priority to the crossovers? That's right. In this case, there was the intervening lockout that changed the situation that made it unlike the TWA case that the company relies heavily on. The company made that decision to lock out its employees. I believe that their vice president, Ms. Powers, gave some general testimony that we cite in our brief that this is what it chose to do. This is the extent it was going to in order to lock out the employees to bring the economic pressure to bear. It chose to lock out the crossovers. And once it did, it returned the crossovers to the same position that the full-term strikers were under. And so thereafter, to use the— I thought they were required to lock out the crossovers. That wasn't an issue that the board made a decision on here. That's a decision that the company chose based on its own counsel that it was required to return the crossovers. But— Is that not the law? Well, I'm sorry, but that would have to be for the board to address in the first instance because that wasn't an issue here. What is the board's law on that? What is the law, in your opinion, on that? I'm not sure, Your Honor. I'm not sure, to be frank, about what the board would have done had the— So what you're saying is the law is unsettled in that area, even from the board's point of view? I believe that it is, but— I'm sorry, I don't have a more satisfying answer for that question, Your Honor. But what is clear is that once the— If they hadn't done it, they were risking a labor violation. Well, that was the opinion. That was the belief that they were under. Does the board share that opinion or not? I'm just asking you, what do you think the law is? Do you think they would have violated the Labor Relations Act had they not locked out the crossovers? I understand, Your Honor. That would help me to know what the board's position is. I understand that, Your Honor. I don't have a clear case one way or the other about what that would have happened. So would you agree that the law is unsettled at a minimum? I would agree that— Unfortunately, I don't have a case to cite to you about what would have happened. I believe it is unsettled in that respect, but I feel like I'm— You can respond about a letter to us if you deem it important to resolve it. Thank you, Your Honor. I will, and I apologize for— No, I mean, I'm just— No, you're correct. I wish I did. I wish I had a more clear answer for you. There's also a great deal of discretion when the general counsel chooses to initiate a complaint or issue a complaint, and I can't say whether they would have done that. But, I mean, just from the company's perspective, you're trying to follow the law and you think you're required. Of course. You said, well, once you did that, then you can't go back. That seems like a catch-22. Well, it's not exactly that they couldn't go back. They didn't need to lock it. Of course, they didn't need to choose to employ this economic weapon in the first place. Well, that would mean you're just limiting their options when they choose lock it. I'm just trying to ask— But there are consequences. I'm trying to find out what those consequences are. I understand. If I could draw an analogy that doesn't exactly answer the question, but when a union decides to go out on strike, there are certain consequences there, primarily being that the employer can bring in permanent replacements and fill those vacancies on a permanent basis, meaning strikers, upon recall, will not be recalled, if at all, until much after the strike has ended. And so that's a consequence that they bear. Here, once the company chose to lock out its employees, it returns them to a general pool of locked-out employees. And so when they return— My question is, does it have the option to treat them as permanent employees, or is it required to return them? That's a question of law. Yes. I certainly understand. I certainly understand. And I will look and see if there was anything that should have been included in the brief, and my apologies that it was not. If you have something else you wish to say, you may say it. Just as a general matter, I'm certainly happy to answer questions about the other violations. The Board found that these did constitute—supported the inference that there was animus. I would remind the Court that, number one, the failure to include Kelvin Brown on the recall list took place this same weekend. The Board found that it effectively was a decision made on Saturday, December 1st, because as of Sunday, December 2nd, Mr. Brown's name was not on the recall list. This was an 83 violation supporting the animus finding. The company no longer contests the finding, the Board's finding, that the suspension of Marion Cook, I believe, for the scab comment, no longer contests that that was a violation. What does the consequence say? If we say, yes, the employer violated the National Labor Relations Act in some of these instances that you're referring to, but there was no anti-union animus involved in it, that means that—that would mean, if that's what we held, that the lockout would be legal, but then they would have violated 8A1 or 8A5, perhaps, and they'd have to post a notice. Is that the consequence? Well, they would post a notice, but some of these other violations were 8A3 violations, Your Honor. The denial of the accrued vacation leave was an 8A3. The suspension and the discharge were also 8A3 violations. So, yes, it does change the mix, certainly, of the Board's findings. Okay. Thank you, Mr. Merritt. Thank you, Your Honors. Yes, indeed. Mr. Merritt, we'll hear from you. Thank you. May it please the Court. I'm here on behalf of the Industrial Division of the IOE CWA. I'm going to address three basic points about— You're representing the—oh, I see, the Local 313. Local 313. Okay, good. I have three basic points I'm going to touch on, the connection of the ULPs to the decision to lockout, the discriminatory nature of the recall, and the bargaining. I did want to make one point initially, though, and I think it's a very important point, because in the brief, Tressa Rand argues that the Board's position would eviscerate lockouts. This case is not about lockouts. It's about partial lockouts. And partial lockouts are reserved for cases where there's extreme business exigencies, and the partial lockout is based on operational needs. That's what the Midwest Generation case tells us. That's not this case. But now, so you're arguing against the finding of the Labor Board itself in that respect? No, no, no. I think it's consistent with what the Labor Board found. The Labor Board, it's important to note, the Board didn't make a decision whether or not Tressa Rand had a legitimate and substantial business justification. The Board accepted to the administrative law judge's findings, and the Board decided it didn't need to get to that question. Although I do want to talk about it, because I think Judge Owen asked the right question about what's the law on partial lockouts. And Tressa Rand asserts that they acted in compliance with the law, specifically Midwest Generation, in locking up the crossovers. But that's incorrect. That's not what the law requires. In fact, Midwest Generation stands for the opposite proposition. I cite in my brief what Midwest Generation said is, if you lock out in a completely blind fashion, then there's no legitimate and substantial business justification. But if you lock out based on union activities, then that's an invalid anti-union motivation. And that's at page 661 of Midwest Generation. Now, the Board didn't get to that point. They decided the after, you know, the after. Well, I'm trying to figure out what are the consequences if we accept your argument, and it's not one that was covered in the Board order or addressed by the Board, what do we do? What is the consequence of our siding with you? Well, I recognize, and I'm not arguing that you should find that there was not a legitimate and substantial justification for the partial lockout because the Board didn't decide that. But it sheds light on the motivation in this case, and I think that's very important because that's where the connection comes in. Every decision that Vice President Elizabeth Powers made from the inception of the lockout all the way through was about this connection to the ULPs. She had great anguish about locking out the crossovers. They had abandoned the strike on behalf of the company. We understand that. We've already gone through this. The law is unsettled on that. But you could have anguishment about that. I don't think the law is not unsettled. Well, we heard. That's what we heard. Well, I'm not necessarily in agreement. Do you mean the case that says it's not? What Midwest Generation says, and that's 429 F3rd 658. I don't know what that's a pin say. But anyway, it's Midwest Generation. What the law says is you have to have a business justification for a partial lockout. You can't just lock out one. I thought you generally had to have a business justification for locking out. I mean, it's bargaining, too. Well, for a lockout, you have to have – a lockout is different than a partial lockout. A lockout doesn't implicate Great Dane. A partial lockout does because it's inherently discriminatory. So that's why you have to go through the Great Dane analysis. And everything that the Dresselring did from the inception of the lockout – Judge, I want to ask you for your case. You gave the case. That's the case that holds squarely. It says you have to have a legitimate business justification. I was asking about the crossovers. I thought you said the law is settled, but you can't – The law doesn't require you to just – what Dresselring did is they just locked out the partial – I mean, the crossovers because they thought that's what the law said. But that's not what the law says. What the law says is you have to have a business justification for doing it. And just locking them out so that your partial lockout appears to be lawful is not a justification. That's unlawful itself. So then when the recall came – I really think we're not getting anywhere in this argument. I mean, I – I'll give you 30 seconds to bring it to a close. All right. I think the TWA case is an opposite for an important reason. That was a case where TWA bargained. There wasn't a lockout. They bargained over the recalls. The union didn't get what it wanted, and then it went to court. That's not this case. There wasn't bargaining. There wasn't bargaining in this case. This case was a lockout. All right. Tell me what happened. All right. Sunday you get what you expected, which the company said, we don't propose to do this strictly by seniority. We propose seniority needs, et cetera. Then you get from them in a more detailed fashion what you were told to expect on Sunday morning. And what was the union's response? Well, at that point we knew they had recalled the crossovers. They were already – How did you know that? We knew that on Friday. How did you know – all right. It's a small-town people talk. They started recalling the crossovers on – they started returning Sunday, almost contemporaneous with us getting the recall list. They were already putting that into motion. Did you object at that point and say, we want to bargain over the crossovers? Well, I was actually in a car driving back. Not you, but, I mean, the union. I don't mean you personally. I don't know if they – that I don't really know if they objected. At that point everything was being set in motion. There wasn't much – at that point there was no point to bargain. Okay, Mr. Murray. Thank you very much. I think we have your argument. Mr. Curnow, you have time for rebuttal. Thank you, Judge. If it's okay, I'll just take the entire five minutes to cover the points raised by the board and the union. I'll start with the crossover point. As the panel recognized, the company was really facing a catch-22. I mean, it was clear by the Seventh Circuit's decision in Midwest Gen that they faced real liability if they did not lock out the crossovers. That's what that case held, and that was undisputed below. In fact, the general counsel conceded before the ALJ that if we had not locked out the crossovers, we might very well be talking about a different violation. The problem is once you have crossovers and you want to implement a lockout, which is entirely reasonable and legal, what do you do upon – Partial lockout. A partial lockout. That's fine. What do you do upon the end of the lockout? And that's where the Supreme Court's case in TWA comes in. Now, the cases they cite are an apposite because they did not involve – the crossovers had never been reinstated. They were still waiting in line with the full-term strikers. There had been no reinstatement here. They had been reinstated. They were just temporarily laid off, and that's where we would cite the court's decision in Delta-Macon. They were reinstated first? Correct, before the lockout was implemented. Before the list of who was going to be reinstated was – Well, I meant they were reinstated before the lockout even began, during the strike. They wanted to cross the picket line. The company permitted them, and they were reinstated to the positions they had before. Once the lockout was implemented, they were required by law. I mean, I would be happy if that law didn't exist, but that was the law that they were facing. They locked them out, and then they were reinstated immediately after the lockout ended. I'll turn to talking about the lockout, and we're happy to hear the boards concede that they are relying only on the post-lockout events as evidence of animus. It was a little unclear what the union was arguing with respect to that, but you heard the board say that the partial lockout itself is not evidence that they're relying on of animus. I think that's very important, and that makes this court's job a little easier because, as we've pointed out before in our brief and earlier in the argument, the five post-lockout events have a lot of problems. One, they don't show animus, as some of the questions were indicating, and two, they occurred so much farther in time from the prior lockout decision. The event closest in time was the reinstatement of the crossovers, which, again, we believe we were entitled to do pursuant to the law. But as Member Johnson said in dissenting, he pointed out that that was just the result of the innocent circumstances of the parties trying to reinstate the strikers as quickly as possible. Judge Jolly asked a question about general animus hovering over there, if that's enough. I would cite to you the Seventh Circuit's opinion in Carlson Roofing that held the existence of inchoate animus is not enough to show that a decision was primarily motivated by that animus. You have to link it to the actual decision made and show that it was that animus that motivated the decision. And finally, I'll talk about the bargaining over the recall. We don't dispute that the union had requested to bargain in that Thursday afternoon conference call when they made their initial proposal. The problem is we were bargaining. We were negotiating with the very person the union told us to negotiate with, their outside counsel, and he simply went radio silent. Under the circumstances here where everyone was working to get— The way I recall the record, or the briefs, was that you were also copying the union on everything you did. That's correct, right. We sent the proposals to the union hall as well. What was the union's response on Tuesday? What did they say? So the union's response on Tuesday was a letter from their outside lawyer, Mr. Murray, objecting to the recall order. But, importantly, he did not object to the fact that no bargaining had occurred. That objection didn't come into play until months later when the first charges were filed. So on Friday afternoon, when we sent the letter that said we were proposing a mixture of seniority and performance, not only did he not object then, he didn't object through the weekend when we sent the list. He didn't object on Monday when we started calling people. He didn't object on Tuesday when they started reporting to work. He said we object because we think it should be based on seniority. Did you respond and say— That objection was never made. He made that initial request was made on Thursday afternoon in the conference room. What did he say on Tuesday? We object to what? We object to the process that you've proposed, not to the fact that we allegedly didn't bargain over the process. Okay, and did you get back and say, well, we're willing to talk some more about it, or what? Or you said, no, that's it, this is our— Well, at that point, I mean, that was the first time we had heard from him since Friday evening when he said, okay, I'll be monitoring email. But you didn't get your plan to him until Sunday morning at 11-11 or whatever time. That's correct. All right, so you just took their silence to be accession. We took their silence to be that they had abdicated the responsibility to bargain. We were trying to bargain. Once they objected Tuesday morning, you realized they do object. Did you say, okay, let's talk about this? No. No, we had already begun recalling the employees to— That's why they say you presented it as a fait accompli. They say we presented it as a fait accompli on Sunday, but they ignore the fact that on Friday evening we had made our proposal. We had said this is what we propose to do. I would cite to the Court the Board's own decision in the Amhart Industries case. It's a very similar case where the question was bargaining over recall after a strike. In that case, it was very similar. The employer said we're going to start calling them on Tuesday. They told them that on a Friday. Didn't even tell them the process they were going to use and then began doing so. The union later objected, and the Board said that was sufficient to satisfy the bargaining requirement because of the exigency of the circumstances. I mean, as Judge Owen pointed out, we were in a catch-22. We were between a rock and a hard place. If we did not recall them immediately, we faced an unfair labor practice charge for that. But if we just started reinstating them, then we would have faced an unfair labor practice for failure to bargain. Okay. Thank you, Mr. Cook. Thank you. We'll call the next case of the day, and that's Mendez v. Taylor.